UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                                    Crim. No. 2:08-CR-23-4

Jean Verdiner,

                Defendant.


## REPORT AND RECOMMENDATION
(Doc. 157)

In October 2008, Defendant Jean Verdiner was convicted in this district on one

count of knowingly and intentionally distributing 500 grams or more of cocaine, a

Schedule II controlled substance, on February 28, 2008 in violation of 21 U.S.C. §§

841(a)(1) and (b)(1)(B), following trial by a jury.  (Doc. 129.)  Before the Court is

Verdiner's Motion for a New Trial Based on Newly Discovered Evidence, *see* Fed. R.

Crim. P. 33.  (Doc. 157.)   The newly discovered evidence arises from 2009 criminal

charges against Ronald Saldi, a cooperating defendant and a government witness in

Verdiner's trial.  (Doc. 172 at 27; Doc. 195-2; *United States v. Saldi*, 2:09-mj-23 (Doc. 5-

1).)  Several months after Saldi testified, the United States Attorney received information

indicating that Saldi had not been honest with investigators and that he continued his

involvement in drug distribution while he was cooperating with the Government.  (*Id.*)

Verdiner argues that this evidence entitles him to a new trial because it

"impeach[es] the credibility of a critical Government witness" and "suggests that the

witness committed perjury."  (Doc. 157 at 14.)  The Government argues that no new trial

is required because the evidence is merely cumulative or impeaching and "because all the critical facts involving Saldi happened on tape and/or under police surveillance." (Doc. 165 at 1, 6-8.) For the reasons stated below, I recommend that the Court DENY Verdiner's motion.

## **Preliminary Statement**

On April 17, 2008, four individuals were charged in a Superseding Indictment with violations of the Controlled Substances Act, 21 U.S.C. § 841. Count 1 charged Jean Verdiner, Shoubert Beauchamps, Paul Harvey, and Linnie Harvey with knowingly and intentionally distributing 500 grams or more of cocaine in violation of 21 U.S.C. § 841(a)(1). (Doc. 45 at 1.) Counts 2 and 3 charged Linnie Harvey with two additional counts of the same crime. (Doc. 45 at 2-3.) Linnie Harvey and Paul Harvey pleaded guilty and agreed to testify against Beauchamps and Verdiner pursuant to cooperation plea agreements.[1] (Docs. 85, 94.) Verdiner and Beauchamps proceeded to trial. A jury convicted Verdiner of the distribution offense and acquitted Beauchamps of the same. (Docs. 108, 138 at 100.)

Counsel for Verdiner filed a timely notice of appeal. (Doc. 130.) While the appeal was pending, the Government wrote a letter to Verdiner's trial counsel, Elizabeth D. Mann, dated April 1, 2009, which stated in part:

Dear [Counsel]:

---

[1] Paul Harvey was sentenced to three years probation, including four months home confinement. (Doc. 134.) Linnie Harvey was sentenced to six months imprisonment and four months home confinement. (Doc. 153.)

> This is to inform you that Ronald Saldi, who testified for the
> Government in the trial last year of your client, Jean Verdiner, was recently
> arrested for distribution of a small amount (roughly a quarter pound) of
> marijuana.  What is more important is that the Government now believes
> that he had kept some marijuana and cocaine hidden from the Government
> at the time of his [January 2008] arrest, lied about that to the Government
> during his cooperation and sold it during his cooperation.  The Government
> also believes that Saldi was not completely truthful in his statements to the
> Government about the identity of at least some of his drug customers.  The
> Government was not aware of any untruthfulness at the time of his
> testimony in the trial of Mr. Verdiner nor is the Government aware of any
> untruths told by Saldi in the course of his testimony.

(Doc. 172 at 27.)

Saldi's conduct was later described in greater detail in an affidavit of a Vermont

Drug Task Force (VDTF) agent, submitted in support of a criminal complaint filed

against Saldi on March 24, 2009.  *See United States v. Saldi*, 2:09-mj-23 (Doc. 5 at 1);

(Doc. 195-2).  The criminal complaint charged Saldi with engaging in a conspiracy with

others to distribute cocaine and marijuana from March of 2008 until March 23, 2009.

(*Id.*)  These dates overlap with the time that Saldi was already under indictment and

ostensibly cooperating with law enforcement in the investigation that led to Verdiner's

arrest.  The affidavit submitted in support of the March 24, 2009 complaint against Saldi

stated that:

> Starting in about August, 2008, Saldi . . . started advancing ounces of
> cocaine to [another cooperating individual].  In return [the cooperating
> individual] supplied Saldi with OxyContin pills, to which Saldi is addicted.
> Saldi has a prescription for OxyContin pills but wanted to purchase more
> than he could get through his prescription.

(Doc. 195-2 at 10.)  The affidavit further provided that Saldi also revealed his own status

as an informant to others, revealed the identity of a VDTF undercover agent, and boasted

to another person that investigators had failed to find either a half kilogram or a kilogram of cocaine and forty-five pounds of marijuana during a January 2008 search of Saldi's residence.  (Doc. 195-2 at 9.)

Although Saldi's assistance to law enforcement led to Verdiner's arrest, Saldi's cooperating activities were not performed under a formal cooperation agreement.  It was not until October 7, 2008, just days before the start of Verdiner's trial, that Saldi entered into a plea agreement in which he formally agreed to plead guilty to engaging in a conspiracy to distribute cocaine and possession of a firearm as a previously convicted felon.  (Doc. 195-1); *see* 21 U.S.C. §§ 846, 841(b)(1)(B); 18 U.S.C. § 922(g)(1).  Saldi also agreed to cooperate with the Government.  (Doc. 195-1.)  Specifically, Saldi agreed to "cooperate completely, candidly and truthfully" by providing investigators with "all information in his possession" relating to any criminal activity.  (Doc. 195-1 at 3.)  In exchange for his pleas of guilty and his cooperation, the Government agreed to move for a downward departure from the applicable Sentencing Guideline pursuant to U.S.S.G. § 5K1.1 and to make "the nature, extent and value" of Saldi's cooperation known to the sentencing judge.  (Doc. 195-1 at 5.)  Saldi testified at trial subject to those obligations, yet he failed to reveal his continuing criminal conduct.  (Doc. 136 at 185-226; Doc. 137 at 29-37.)

In light of the Government's disclosures, counsel for Verdiner filed an unopposed Motion for Remand, and the Court of Appeals remanded Verdiner's case to the District Court.  (Doc. 156.)  Verdiner then filed the instant Motion for a New Trial (Doc. 157),

which was referred to the undersigned.  (Doc. 180.)[2]  Delay in the consideration of this

motion has occurred as the defendant has reported conflict with prior counsel.  Presently,

Verdiner is ably represented by Attorney Eric Miller.

### Trial Evidence

Witness testimony at Verdiner's trial revealed the following relevant facts.  (Docs.

136, 137, 138.)

I.    **Linnie Harvey**

Linnie Harvey, a life-long drug abuser, first met Verdiner in 2006.  (Doc. 136 at

126.)  She testified that she began purchasing cocaine from Verdiner "[a]lmost every

week, sometimes twice" primarily for her own personal consumption.  (Doc. 136 at 128.)

At first, Linnie[3] purchased cocaine from Verdiner in eighth or quarter-ounce quantities,

but after a short time, the quantities increased to one ounce or greater.  (Doc. 136 at 129.)

Linnie drove a car provided to her by Verdiner and met him at various locations in

Vermont and New Hampshire for cocaine transactions throughout 2006 and 2007.  (Doc.

136 at 132-33, 141.)

Linnie testified that she sold cocaine to her brother-in-law, Paul Harvey, "[o]n a

few occasions."  (Doc. 136 at 141, 173-74.)  In January or February 2008, Paul, at Saldi's

request, asked Linnie if her suppliers could obtain a kilogram of cocaine.  (Doc. 136 at

142-43.)  Linnie got in touch with Verdiner, who confirmed that he "could possibly get

---

[2]  Verdiner also filed two motions *pro se*, seeking to vacate his sentence under 28 U.S.C. § 2255. (Docs. 164, 172.)  The undersigned defers consideration of these motions to vacate until the instant Motion is ruled on by the district court.

[3]  Witnesses Linnie Harvey and Paul Harvey are referred to by their first names for clarity.

that amount." (Doc. 136 at 143.) The transaction was to occur at the Hilltop Inn in Berlin, Vermont in late February 2008. (Doc. 136 at 144.)

Linnie's trial testimony revealed that Linnie was addicted to cocaine and that she had been using and selling drugs for the majority of her life. (Doc. 136 at 156-57.) Linnie testified that, on the day of the arrest of Verdiner she had been awake for ten days straight using cocaine. (Doc. 136 at 168.) She further testified that, two hours before the Court convened on the day of her testimony, she ingested Dilaudid and Valium that had been prescribed to her because of a recent knee surgery. (Doc. 136 at 158-59.) It was unclear from her testimony whether the amounts she ingested were the prescribed amounts. (*Id.*) Linnie admitted that the narcotics had some effect on her ability to "think and know what [she was] doing." (Doc. 136 at 159.)

## II.    Paul Harvey

Paul Harvey was also a life-long drug addict, and had been buying his drugs from Saldi for a number of years. (Doc. 137 at 37-39, 61-62.) Paul testified that as of February 2008 he owed Saldi approximately $4,500 for prior cocaine purchases. (Doc. 136 at 110.) As part of his cooperation with VDTF, Saldi phoned Paul in January or February 2008 to see if Paul knew of a way Saldi could purchase a significant quantity of cocaine. (Doc. 136 at 60.) Eager to repay his debt to Saldi, Paul phoned Linnie to see if she knew of anyone who could get Saldi a brick[4] of cocaine. (Doc. 136 at 142.) After asking around, Linne received a phone call from Verdiner, who said he could "possibly

---

[4] The jury learned that a "brick" is a term used to refer to a kilogram of cocaine. (*See* Doc. 136 at 60.)

get that amount." (Doc. 136 at 143.) Saldi, Linnie, and Paul then brokered the deal in which Verdiner would sell Saldi one kilogram of cocaine. (Doc. 136 at 142-43.) Government trial exhibits included recorded phone conversations between Paul and Saldi, in which they discussed the logistics of the anticipated cocaine sale. (Doc. 136 at 60-61; Ex. 71a.)

## III.  Ronald Saldi

Saldi was arrested in January 2008 for selling fifteen ounces of cocaine, and agreed to cooperate with VDTF by revealing the names of suppliers and contacting them to arrange drug deals. (Doc. 136 at 186-89.) Saldi testified that he was unsuccessful in arranging any deals of sufficient magnitude with his regular suppliers, but his cooperation instead led to the Hilltop Inn cocaine transaction brokered by Paul and Linnie. (Doc. 136 at 54-55.)

At trial, the jury heard substantial testimony about Saldi's extensive criminal history as a dealer who had been involved in significant drug sales. Specifically, the jury heard that Saldi had been selling marijuana, illicit mushrooms, and cocaine in Vermont for approximately seven years (Doc. 136 at 186, 202), that he had been convicted of a drug felony offense in state court in 2002, and that he had immediately resumed selling cocaine in 2003 and sold cocaine steadily up until the time of his arrest in January 2008 (Doc. 136 at 186-87). The jury also heard that, when Saldi was arrested, VDTF officers "found a couple ounces of cocaine, somewhere in the neighborhood of t[w]o pounds of marijuana, over a pound of mushrooms," and more than $110,000 in cash in Saldi's

home.  (Doc. 136 at 53.)  Saldi himself testified that, between 2006 and 2007 he acquired

kilogram quantities of cocaine for resale a "[c]ouple times a year."  (Doc. 136 at 188.)

Saldi was questioned at trial about his activities during the time he was

cooperating with the Government:

Q  After your arrest in January of 2008, did you decide to cooperate with
   the government?

A  Yes.

Q  And what did you do as part of your cooperation?
      . . . .

A  Help[ed] the government target individuals.

Q  Well, did you give the names of your suppliers to the police?

A  Yes.

Q  Did you attempt to contact them to make deals?

A  Yes.

Q  Did you in fact make any deals while working for the government with
   any of the people that had been your suppliers?

A  No.

(Doc. 136 at 189.)  As noted above, however, the Government later revealed that it

learned that Saldi "was not completely truthful in his statements to the Government about

the identity of at least some of his drug customers" and that "he had kept some marijuana

and cocaine hidden from the Government at the time of his arrest, lied about that to the

Government during his cooperation and sold it during his cooperation."  (Doc. 172 at 27.)

Saldi was also questioned at trial about his own drug use.  Saldi testified that he had a history of using drugs since his early twenties, including marijuana, cocaine, and mushrooms.  (Doc. 136 at 185-86.)  As noted above, however, the affidavit of VDTF officer Jared Hatch, submitted with the subsequent criminal complaint against Saldi, stated that Saldi was addicted to OxyContin, that he would advance cocaine to his customers in exchange for the powerful opiate, and that he continued to sell drugs while purportedly cooperating with the VDTF.[5]  (*See* Doc. 195-2 at 6-11; *United States v. Saldi*, 2:09-mj-23 (Doc. 5-1 at 6).)

## IV.   The Sale of One Kilogram of Cocaine at the Hilltop Inn

At Verdiner's trial, the Government presented audio recordings of conversations Saldi had with Paul Harvey leading up to the events at the Hilltop Inn on February 28, 2008.  The recordings show Paul and Saldi coordinating logistics for the sale.  On February 27, Saldi phoned Paul, who assured him that the supplier was in the area and that the sale would go forward:[6]

RS:  You're sure we're on right?

PH:  Yup.

RS:  One hundred percent, you've seen the stuff, you looked at it, everything's there, and I ain't gonna get dicked around?

PH:  No you aren't going to get dicked around.

---

[5] This criminal complaint was ultimately dismissed.  *See United States v. Saldi*, 2:09-mj-23, (Doc. 10).  The Government elected to not file the § 5K1.1 substantial assistance motion at Saldi's sentencing, and Saldi was ultimately sentenced to a term of imprisonment of 108 months for the conduct charged in criminal complaint 2:08-mj-26-jjn-1.  *See United States v. Saldi*, 2:08-cr-41-wks, (Doc. 102).

[6] "RS" refers to Ronald Saldi.  "PH" refers to Paul Harvey.

. . . .

RS:  [Y]ou haven't seen it?

PH:  No.  But he's here cause he's seen my sister-in-law already too.[7]

(Ex. 71a.)

The following day, VDTF officers searched Saldi's person and his vehicle, outfitted him with a wire and digital recording device, and placed him under visual surveillance.  (Doc. 136 at 78.)  Saldi picked up Paul two miles from the Inn and they arrived together, pulling into the parking lot in Saldi's vehicle.  (*Id.*)  Members of the drug task force were positioned across the street in undercover vehicles.  (Doc. 136 at 77-79.)  Paul got out of Saldi's vehicle and walked toward the entrance of the Inn.  (Doc. 136 at 77-83, 195; Ex. 85a.)

As soon as Paul was out of earshot, recordings from Saldi's wire revealed the following direct communication with VDTF through the wire:  "He wants me to go there but I'm not going over there.  Looks like he's bringing a Dominican with him and a girl.  Don't let me get shot boys."  (Ex. 85a.)  Paul then arrived back at Saldi's vehicle and got in the back seat.  Verdiner got in the front seat.  The jury heard the following conversation:[8]

RS:  How ya doing man?

JV:  Alright.

---

[7]  Although the conversation suggests that Paul had seen the supplier in the area, he testified at trial that had not actually seen the cocaine or the supplier at that time, but that he "was telling [Saldi] anything I needed to tell him to make him feel safe and make the deal go through."  (Doc. 137 at 50.)

[8]  "JV" refers to Jean Verdiner, the defendant.

10

         . . . .

RS:  I just want to make sure I'm getting what I want.

PH:  Your (sic) not getting' conked on the head.

RS:  Yup.

JV:  Yeah its just straight up.  You're not a cop are ya?

RS:  No, No.  Far from one of them.

JV:  It's a brick, man.

RS:  Any way we can open that and look at it?

JV:  You can look at it, there's a star right here.

         . . . .

RS:  Good stuff right?

JV:  Yeah man, you're going to like this.  See, I met him ya know, I'm doin that for him because I met him, met him through my girl ya know, right there.

PH:  That's my sister.

         . . . .

RS:  Shit you got this fucking thing wrapped so fucking

JV:  There's a stamp on it and everything.

RS:  This is premo.

JV:  Trust me, you be happy with my shit man [inaudible].

         . . . .

PH:  I could smell it as soon as you took the tape off.

RS:  I want to see it.

> . . . .
>
> PH:  It's premo like I told ya.
>
> RS:  Alright.
>
> PH:  Where's his money?
>
> RS:  Well just let me grab it.  You hold on to it until I give it to you . . . .

(*Id.*)  Saldi then opened his vehicle door to retrieve payment from the back seat, whereupon law enforcement moved in to make arrests and to seize the cocaine, which was found on the ground outside of the truck.  (*Id.*)

There were inconsistencies between the trial testimonies of Paul and Saldi with respect to precisely how events unfolded in Saldi's truck.  Paul testified that, from where he was seated in the back seat, he did not actually see Verdiner take the cocaine out, however, he saw the cocaine appear on the center console after the defendant was inside the truck sitting in the passenger seat.  (Doc. 137 at 55.)  Paul also testified that, as law enforcement descended upon Saldi's truck, Verdiner threw the cocaine at Paul and that Paul then "tried to throw it out the door towards . . . Saldi."  (Doc. 137 at 56.)  By contrast, Saldi testified that it was Verdiner who threw the cocaine at him.  (Doc. 136 at 201.)

## **Standard of Review**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Rule 33 confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d

Cir. 1992). However, this discretion should be exercised sparingly and "only with great caution and in the most extraordinary circumstances." *Id.* at 1414. The Second Circuit has observed:

> The defendant bears the burden of proving that he is entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment.

*United States v. McCourty*, 562 F.3d 458, 475-76 (2d Cir. 2009) (quotations, citations and brackets omitted).

## Discussion

To receive a new trial based on newly discovered evidence, the defendant must show "(1) the evidence [is] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Owen*, 500 F.3d 83, 88 (2d Cir. 2007). Here, the first two factors are conceded by the Government. Accordingly, the Court need only address whether the evidence is material, not merely cumulative or impeaching, and whether the evidence would likely have led to an acquittal.

Evidence may be material "where the witness in question supplied the only evidence linking the defendant to the crime . . . [or] the witness supplied the only evidence of an essential element of the offense." *United States v. Avellino*, 136 F.3d 249,

256-57 (2d Cir. 1998). Evidence is merely cumulative or impeaching when it challenges a witness's credibility that "has already been shown to be questionable or who is subject to extensive attack by reason of other evidence." *Id.* at 257. With respect to perjured testimony, "[w]here the government was unaware of a witness' perjury, . . . a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (quotation and brackets omitted). Materiality "must be judged in the light of all the evidence presented at trial" and "even when corrective action should be undertaken by the prosecution, there is no reversible error" when the evidence is not material. *United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir. 1987).

Verdiner argues that the newly discovered evidence is material because it (1) undermines the foundation of the Government's case (Doc. 195 at 12); and (2) "provides substantive evidence of [the defendant's] innocence" (Doc. 195 at 13). Pointing to inconsistencies among the testimonies of Paul and Linnie Harvey, Verdiner argues that the facts establish that "the jury had to believe the testimony of Saldi in order to convict" him. (Doc. 157 at 14.) Similarly, Verdiner asserts that, because the jury acquitted his co-defendant, Beauchamps, this establishes that the jury chose not to credit Paul and Linnie's testimony, thereby making Saldi's testimony essential. (Doc. 157 at 16.)

Although the Government's case relied upon Saldi's testimony, the most compelling evidence of Verdiner's guilt was the audio recording quoted above of Verdiner selling cocaine to Saldi. (Ex. 85a.) Having carefully reviewed this recording, I

14

find that Verdiner has not met his burden of proving that the new evidence would likely have led to an acquittal.

The audio tape, more so than Saldi's testimony, constituted "the foundation" of the Government's case.  (Doc. 195 at 12.)  In the recording, Verdiner is plainly heard to attest to the quality and quantity of cocaine.  (Ex. 85a.)  Verdiner described his product as a kilo or "brick," of good quality, with "a stamp on it."  (*Id.*)  Verdiner then removed tape from the package so that Saldi could examine it.  (*Id.*)  Verdiner assured Saldi that he would "be happy with" the cocaine.  (*Id.*)  On the same recording, Paul made statements regarding the quality of the cocaine after receiving permission from Verdiner to examine it.  Specifically, Paul stated, "I could smell it as soon as you took the tape off" and [i]t's premo."  (*Id.*)  On the tape, Saldi prepared to get out the money to give to Verdiner and Verdiner neither expressed surprise nor objected.  (*Id.*)

The audio recording of Verdiner's drug transaction is of particular clarity. Notwithstanding that Saldi concealed his actual criminal involvement from the Government at every stage of his purported cooperation, and may have perjured himself at trial, the audio tape evidence speaks for itself.  Thus, viewing the newly discovered evidence in light of all of the evidence presented at trial, the newly discovered evidence would not have introduced a reasonable doubt such that it would likely have led to an acquittal.

Certainly, evidence of Saldi's continued participation in drug activity, dishonesty with VDTF, and evidence that he was using OxyContin not prescribed to him erodes Saldi's credibility as a witness.  Further, the fact that the investigators failed to discover

15

all of Saldi's drugs is relevant to the thoroughness of the investigation.  Had Verdiner

known of this evidence at the time of trial, it would have provided him with additional

material upon which he could have cross-examined Saldi and other witnesses.  However,

judging the new evidence "in the light of all the evidence presented at trial," it does not

ultimately diminish the significance of Verdiner's own recorded statements.  *Petrillo*, 821

F.2d at 89.

Similarly, there is no merit to Verdiner's claim that "the newly discovered

evidence would have prevented the Government from putting Saldi on the [witness]

stand, thereby guaranteeing acquittal."  (Doc. 195 at 16.)  It is highly unlikely that the

Government would have refrained from calling Saldi to testify had the newly discovered

evidence existed at the time of trial, given that the Government opted to call Saldi to

testify knowing that he was the subject of significant impeachment evidence.

Specifically, as mentioned above, the jury heard evidence of Saldi's lengthy personal

history as a drug dealer and abuser.  (Doc. 136 at 104, 117-18, 186-87.)  The jury also

heard testimony that approximately thirteen firearms were found in Saldi's residence, and

that, following his felony drug conviction in 2002, Saldi resumed selling drugs almost

immediately.  (Doc. 136 at 117, 187.)  Moreover, the jury was made aware that Saldi was

arrested in January 2008 for selling fifteen ounces of cocaine (Doc. 136 at 186-89), that

Saldi had purchased and sold marijuana, mushrooms, and cocaine in Vermont for

approximately seven years (Doc. 136 at 186, 202), and that, when Saldi was arrested,

VDTF officers "found a couple ounces of cocaine, somewhere in the neighborhood of

t[w]o pounds of marijuana, over a pound of mushrooms," and more than $110,000 in

16

cash in Saldi's home (Doc. 136 at 53).  Further, Saldi himself testified that, between 2006

and 2007, he acquired kilogram quantities of cocaine for resale a "[c]ouple of times a

year." (Doc. 136 at 188.)  Finally, the jury learned that Saldi had agreed to plead guilty

to a felony drug offense.  (Doc. 136 at 226.)

As Verdiner points out, the jury was well aware that the Government's evidence at

trial came from "persons who have committed serious crimes but who are now

cooperating with the government." (Doc. 136 at 39.)  In addition, the jury learned from

the Government's opening statement that the Government's witnesses were "drug users"

and "drug dealers" who were cooperating for the purposes of fulfilling their own plea

agreement terms.  (Doc. 195 at 7.)  To account for such issues, the jury was instructed as

follows:

> You do not have to accept all the evidence presented in this case as
> true or accurate.  Instead, it is your job to determine the credibility or
> believability of each witness.  You do not have to give the same weight to
> the testimony of each witness because you may accept or reject the
> testimony of any witness, in whole or in part.

(Doc. 138 at 70.)  The jury was also instructed regarding any personal interest that a

witness may have in the outcome of the case:

> As a general matter, in evaluating the credibility of each witness,
> you should take into account any evidence that the witness who testified
> may benefit in some way from the outcome of this case.  Such an interest in
> the outcome creates a motive to testify falsely and may sway the witness to
> testify in a way that advances his or her own interests.

(Doc. 138 at 72.)

Although cumulative or impeaching evidence alone will generally not satisfy the

requirements for granting a new trial, *Avellino*, 136 F.3d at 257, Rule 33 does not prevent

a court from granting a new trial on the basis of newly discovered impeachment evidence in cases where "justice so requires." Fed. R. Crim. P. 33(a). In *United States v. Taglia*, 922 F.2d 413 (7th Cir. 1991), the defendants were convicted of labor racketeering. Subsequently, it was discovered that a key government witness had given false testimony in a different criminal trial that was related to defendant Taglia's conduct. *Id.* at 415. As in this case, however, evidence against the defendant involved recorded conversations which were played for the jury. *Id.* In denying the defendant's motion for a new trial, the Seventh Circuit observed:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted.

*Id.* The court then concluded, however, that even if the jury had given no weight to the witness's testimony, it would have convicted the defendants because the audio tape evidence was "crucial evidence." *Id.* at 416; *see Avellino*, 136 F.3d at 256-57.

The same reasoning applies here. Just as in *Taglia*, the "crucial evidence" consisted of the audio recordings, and the jury would have convicted Verdiner even if it gave no weight to Saldi's testimony. *Taglia*, 922 F.2d at 416.

Contrary to Verdiner's arguments, the circumstances of this case are unlike those at issue in *Wallach*. (Doc. 157 at 14.) In *Wallach*, the defendants were convicted of racketeering offenses, interstate transportation of stolen property, conspiracy to violate the federal conflict of interest law and to defraud the United States, and other fraud-related offenses. *Id.* at 450. The government's primary witnesses against the defendants

18

were individuals who testified pursuant to cooperation plea agreements.  One of the

witnesses had perjured himself in a prior proceeding, and the jury was instructed to

"evaluate his testimony carefully." *Id.* at 455.  It was later discovered that the second

witness had perjured himself on direct examination in the defendants' trial. *Id.* at 456.

The *Wallach* court emphasized that the two witnesses "provided the foundation upon

which the prosecution built its entire case." *Id.* at 455.  These witnesses "offered the only

testimony that directly linked the defendants with the admittedly illegal conduct" and

"their testimony was, to say the least, critical to the government." *Id.*

In *Wallach*, the Second Circuit directly addressed the issue of "whether the

perjured testimony of a key government witness requires a reversal of the convictions."

*Id.* at 449.  It concluded that the "extraordinary circumstances" of that case called for

reversal of the defendants' conviction. *Id.* at 458.  Specifically, the court emphasized that

the witness who perjured himself on direct examination was "the centerpiece of the

government's case" and that "had the jury been aware of [the witness's] perjury it

probably would have acquitted the defendants." *Id.* at 457-58.

Assuming that Saldi in fact perjured himself, the circumstances in *Wallach* are

unlike those at issue here. *Cf. United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.

2001) ("A witness commits perjury if he gives false testimony concerning a material

matter with the willful intent to provide false testimony, as distinguished from incorrect

testimony resulting from confusion, mistake, or faulty memory.").  Although Saldi's

testimony was certainly important to the Government's case, it was not the "only

testimony" linking Verdiner to the conduct charged. *Wallach*, 935 F.2d at 455.  In fact,

the "centerpiece" of the Government's case consisted of the recorded statements made by Verdiner himself during the sale of the kilogram of cocaine.  The jury heard audio recordings of Verdiner as he showed the cocaine to Paul and Saldi and attested to its quality ("Trust me, you be happy with my shit") and its quantity.  (Ex. 85a.)  In its closing argument, the Government characterized Saldi's testimony as important to "set the scene."  (Doc. 138 at 7-8.)  It then re-played the audio recording of the drug transaction for the jury in order to emphasize the importance of this evidence.  In short, I find that there is not a "significant chance" that the newly discovered evidence, if developed by skilled counsel, "could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction" in light of the ample impeachment evidence that was before the jury as well as Verdiner's devastating recorded statements.  *Wallach*, 935 F.2d at 456 (citations omitted).[9]

---

[9]  In arguing that no new trial is required in this case, the Government's reliance upon *United States v. Canova*, 412 F.3d 331, 348-50 (2d Cir. 2005), *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008), *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993), and *United States v. Wong*, 78 F.3d 73, 78 (2d Cir. 1996) is unpersuasive.  In each of those cases, unlike this case, the newly discovered evidence pertained to matters largely collateral to the direct evidence against the defendants or the new trial was denied for reasons not relevant here.  For example, in *Canova*, the court's denial of the defendant's new trial motion was based on its untimeliness, or, alternatively on the fact that the evidence at issue was not in fact newly discovered.  The *Canova* court stated that the defendant "did not demonstrate any witness's actual perjury" and that the evidence "[a]t best, . . . would have afforded defense counsel additional grounds" for impeachment of the government's witnesses.  *Canova*, 412 F.3d at 349.  Similarly, in *Spinelli*, the newly discovered evidence at issue pertained to a government witness who breached his cooperation agreement by failing to disclose that his former fiancée's relatives were involved in several crimes during the time the witness was cooperating with the government.  The crimes were unrelated to the conduct underlying defendant Spinelli's conviction.  *Spinelli*, 551 F.3d at 164.  In *Spencer*, newly discovered evidence showed that the Government's expert chemist witness had taken and used regulated drugs from a police crime laboratory, but there was no evidence that any of the chemist's conclusions or statements of fact were untrue.  *Spencer*, 4 F.3d at 118-19.  Finally, in *Wong*, a government witness testified untruthfully about facts pertaining to income he received as a cooperating individual and the status of his tax returns, evidence that was relevant only to the witness's "bias, interest, and dishonesty."  *Wong*, 78 F.3d at 79.

Verdiner's reliance upon *United States v. Hernandez-Rodriguez*, 443 F.3d 138 (1st Cir. 2006) is also misplaced. In that case, the defendant was convicted of drug-trafficking offenses in connection with his ownership of a trucking company used in a cocaine shipment. *Hernandez-Rodriguez*, 443 F.3d at 140. Testimony and documents leading to his conviction consisted of circumstantial evidence linking Hernandez to a shipment of cocaine from Venezuela to Puerto Rico. *Id.* at 141. Evidence surfaced after trial, however, that Hernandez may have been misidentified by his co-defendant, Gorbea. *Id.* Specifically, it was discovered that four individuals named "José Hernandez" worked at the same Venezuela shipping yard where the cocaine originated. Consequently, a fax in Gorbea's possession with the name "José Hernandez" written on it which was used at trial to prove defendant Hernandez's participation in the conspiracy, was of doubtful probative value. *Id.* at 142.

In granting Hernandez's motion for a new trial, the First Circuit found it significant that the newly discovered evidence "speaks directly to the question of whether Hernandez knew or had reason to know that there were drugs in the container." *Id.* at 145. In addition, the court emphasized that in the Government's closing argument, it told the jury that "the fax constituted evidence of at least one count with which Hernandez was charged and ultimately convicted," when the newly discovered evidence suggested that the name on the fax may have actually been referring to a different José Hernandez. *Id.*

The circumstances in *Hernandez* are unlike the circumstances in this case. The new evidence in *Hernandez* was substantive evidence pertaining directly to whether the

21

defendant was the person who participated in the alleged conspiracy.  Here, by contrast, Verdiner concedes that the evidence of Saldi's dishonesty and continuing criminal conduct is impeachment evidence.  (Doc. 157 at 14.)  Moreover, while Saldi's testimony may have contributed to the implication of Verdiner, the audio tape is far more compelling evidence of guilt.

## Conclusion

"The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States v. Ferguson*, 246 F.3d 129, 134 (2d. Cir. 2001).  Viewing the evidence in its entirety, I conclude that Verdiner has not met his burden to establish that the newly discovered evidence "would likely result in an acquittal."  *Owen*, 500 F.3d at 88.  Accordingly, letting the jury verdict stand would not result in manifest injustice.  Based on the foregoing, I recommend that Verdiner's Motion for a New Trial be DENIED.

Dated at Burlington, in the District of Vermont this 20th day of

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).